**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
Keren E. Gesund (SBN 253242)
680 South Cache Street, Suite 100, P.O. Box 12200
Jackson, WY 83001
Tel: (702) 300-1180
Email: keren@rcornishlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE AND JOHN DOE, a married couple,<br><br>Plaintiff,<br><br>v.<br><br>STANFORD FEDERAL CREDIT UNION; EVERBANK, N.A.; COMMUNITY FEDERAL SAVINGS BANK; CHOICE FINANCIAL GROUP; THE CURRENCY CLOUD INC; TRANSWAP TECHNOLOGIES (UK) LTD; MERCURY ADVISORY LLC; WEALTH TUTOR INSTITUTE; BEACH FOCUSYR INC.; TENGFEI YANG; VISIONARY SOLUTIONS HOLDINGS LTD; HIU FUNG LUI; LUMINA SOLUTIONS HOLDINGS LTD; LOK HIM LO; NOVAVENTURE STONE LTD; and JIANHAO LI,<br><br>Defendants. | Case No. 5:25-cv-07241<br><br>**COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane and John Doe ("Plaintiffs"), by and through undersigned counsel of record, for their Complaint against Stanford Federal Credit Union ("Stanford FCU"); EverBank, N.A. ("EverBank"); Community Federal Savings Bank ("Community Federal"); Choice Financial Group ("Choice Financial"); The Currency Cloud Inc. ("Currency Cloud"); TranSwap Technologies (UK) Ltd ("TranSwap"); Mercury Advisory LLC ("Mercury Advisory"); Wealth Tutor Institute ("WTI"); Beach Focusyr Inc. and its sole owner and control person Tengfei Yang

(collectively "Focusyr"); Visionary Solutions Holdings Limited and its sole owner and control person Hui Fung Lui (collectively "Visionary"); Lumina Solutions Holdings, Ltd and its sole owner and control person Lok Him Lo (collectively "Lumina"); and Novaventure Stone Ltd and its sole owner and control person Jianhao Li (collectively "Novaventure"), state:

## INTRODUCTION

1.    Crypto-fraud scams such as pig-butchering have emerged as a multibillion-dollar criminal specialty that has entrapped victims around the world.[1] Plaintiffs are two of those victims.

2.    Plaintiffs received a Facebook advertisement to join an investment school called the Wealth Tutor Institute ("WTI"). WTI purportedly sought to recruit participants to use their AI 4.0 stock trading platform by providing participants with a free $500 to beta test the tool. After successfully using the platform, Plaintiffs were directed to wire approximately $600,000 between July 30, 2024 and August 2, 2024 to Focusyr, Visionary, Lumina, and Novaventure and their respective owners and control persons Tengfei Yang, Hiu Fung Lui, Lok Him Lo, and Jianhao Li (hereinafter collectively referred to as the "Scammers"). The Scammers maintained bank accounts at the following two banks: Community Federal and Choice Financial. Community Federal transferred Plaintiffs' funds to Currency Cloud which then transferred the funds to TranSwap. Choice Financial transferred Plaintiffs' funds to Mercury Advisory. Community Federal, Choice Financial, Currency Cloud, TranSwap, and Mercury Advisory are hereinafter collectively referred to as the "Recipient Banking Defendants."

3.    Upon learning of the scam, Plaintiffs emailed Stanford FCU, EverBank, ETRADE Savings, and ETRADE Brokerage[2] (hereinafter referred to collectively as the "Initiating Entities") to notify them of the fraud and recall the wires. Plaintiffs have maintained regular communications

---

[1] *See* Tom Wilson, *How "pig butchering" scams have emerged as a billion-dollar crypto industry*, REUTERS (Dec. 8, 2023), https://www.thomsonreuters.com/en-us/posts/investigation-fraud-and-risk/pig-butchering-scams/. "Such pig-butchering scams — so called because the unsuspecting victim of the scam (the pig) is tricked by scammers into forking over money for a promised big return — have drawn intensifying scrutiny from global law enforcement over the past year, but little is publicly known about the people behind them." *Id.*

[2] ETRADE is a member of FINRA. Plaintiffs executed account opening documents that require claims against ETRADE to be arbitrated before FINRA under its customer rules.

with the Initiating Entities regarding the fraud and recovery of their funds.

4.     Plaintiffs also notified the Recipient Banking Defendants of the fraud and requested return of their funds.

5.     Community Federal advised that one or more of the accounts the funds were transferred to had been flagged as fraudulent, prior to the acceptance of Plaintiffs' funds, and that Visionary, Lumina, and Novaventure, had been reported as fraudulent. However, Community Federal has failed to return Plaintiffs' funds.

6.     The Scammers, along with the Recipient Banking Defendants, Community Federal, and Choice Financial, extracted hundreds of thousands of dollars from Plaintiffs and together perpetrated a fraud against them.

7.     Recipient Banking Defendants' complete failure to comply with relevant know-your-customer and anti-money laundering ("KYC/AML")[3] laws when opening accounts for the Scammers amounted to (a) substantial assistance to the Scammers' frauds and (b) willful blindness to business activities that bore "red flags" that any reasonable financial institution would view as criminal and fraudulent. Any simple review of the Scammers would have revealed a *complete lack* of credible evidence that their business activities, if any, were lawful or legitimate. Their decision to bury their heads in the sand and refuse to conduct any modicum of due diligence to verify the identity of their potential new customers aided and abetted frauds for which this Court must hold them liable.

8.     For its part, Stanford FCU has failed to reasonably investigate Plaintiffs' fraud allegations and return the funds to Plaintiffs' accounts and must be held accountable.

## THE PARTIES

9.     Plaintiffs are a married couple residing in San Jose, California. Plaintiffs bring this matter anonymously to prevent drawing the attention of a stalker of Mrs. Doe.

---

[3] Last year, the Financial Crimes Enforcement Network assessed a record $1.3 billion penalty against TD Bank, N.A. and TD Bank USA, N.A. for violations of the Bank Secrecy Act because the entities allowed their AML programs to languish, making TD Bank a target for illicit actors. *See FinCEN Assesses Record $1.3 Billion Penalty against TD Bank*, Financial Crimes Enforcement Network (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank.

10.    Defendant Stanford FCU is a federally chartered credit union headquartered in Palo Alto, California. At all times relevant to this proceeding, Plaintiffs were retail customers of Stanford FCU.

11.    Defendant EverBank, N.A., *fka* First Alliance Bank, *fka* TIAA, FSB, is a national bank with its corporate headquarters located at 301 West Bay Street, Jacksonville, Florida 32202. At all times relevant to this proceeding, Plaintiffs were retail banking customers of EverBank in this District.

12.    Defendant Community Federal is a federally chartered savings bank with its corporate headquarters located at 816 Jamaica Ave, Woodhaven, New York 11421. At all times relevant to this proceeding, Community Federal transacted substantial banking business in this District.

13.    Defendant Choice Financial Group is a state-chartered bank with its corporate headquarters located at 4501 23rd Ave S, Fargo, North Dakota 58104. At all times relevant to this proceeding, Choice Financial Group transacted substantial bank business in this District.

14.    Defendant Currency Cloud is an international fintech payment platform which provides services under a sponsorship by Community Federal. Currency Cloud's headquarters is located at The Steward Building, 12 Steward Street, London, E1 6FQ, United Kingdom. Currency Cloud is registered with FinCEN in the United States as a Money Services Business under Registration Number 31000206794359.

15.    Defendant TranSwap is a cross-border fintech payment platform located in The Bayes Centre, University of Edinburgh, 47 Potterrow, Edinburgh, EH8 9BT, United Kingdom. TranSwap's headquarters is located at 435 Orchard Road Wisma Atria, Number 12-03, Singapore, 238877, Singapore.

16.    Defendant Mercury Advisory is an investment adviser firm registered with the SEC with offices all across the country, including California. Mercury Advisory is a fintech company that offers banking for startups through Choice Financial.

17.    Defendant WTI is a scam entity run by Defendants Focusyr, Visionary, Lumina,

and Novaventure and their respective owners and control persons.[4]

18.     Defendant Focusyr incorporated in Colorado, on April 16, 2024, a few months before the scam began. A true and correct copy of Focusyr's Articles of Incorporation from the Colorado Secretary of State is attached herewith as **Exhibit 1**. Focusyr's listed scope of business is swimwear. *Id*. According to the Colorado Secretary of State, Focusyr became noncompliant on July 1, 2025 and will become delinquent on August 31, 2025. Focusyr has an account with Defendant Choice Financial. Plaintiffs transacted business with Focusyr through the banking services that Choice Financial made available within this District. Plaintiffs' funds were first transferred to Defendant Choice Financial and then to its customer, Defendant Mercury Advisory.

19.     Upon information and belief, Defendant Tengfei Yang is the sole owner  and control person of Defendant Focusyr and, thus, all wrongful acts committed by Focusyr were really committed by Tengfei Yang.

20.     Defendant Visionary incorporated in New York, on May 16, 2024, a few months before the scam began. True and correct copies of the Entity Information of Visionary provided by the New York Department of State is attached herewith as **Exhibit 2**. Visionary maintains an office located at 44 Montgomery Street, San Francisco, California 94104. Visionary is not registered with the California Secretary of State. Visionary has an account with Defendant Community Federal. Plaintiffs' funds were transferred to Defendant Community Federal which were then transferred via banking services offered in this District to Defendant Currency Cloud and then transferred again to Defendant TranSwap.

21.     Upon information and belief, Defendant Hiu Fung Lui, is the sole owner and control person of Defendant Visionary and, thus, all wrongful acts committed by Visionary were really

---

[4] On July 16, 2024, the Washington State Department of Financial Institutions (DFI), Securities Division posted that it had received complaints about companies posing as educational institutions, such as "Business Schools" or "Wealth Institutes," that lure investors through social media into cryptocurrency investment schemes, often using WhatsApp or Telegram groups with titles like "Wealth Club" to provide dubious trading signals and high-return promises. *See Ongoing Trend of Alleged Cryptocurrency Scams Involving Self Proclaimed "Professors" In WhatsApp Groups* (July 16, 2024), https://dfi.wa.gov/consumer/alerts/ongoing-trend-alleged-cryptocurrency-scams-involving-self-proclaimed-professors.

committed by Hiu Fung Lui.

22.    Defendant Lumina incorporated in Hong Kong on June 13, 2024, a few months before the scam began. True and correct copies of Lumina's Certificate of Incorporation, Incorporation Form, and Articles of Association from the Hong Kong Companies Registry are attached hereto as **Exhibit 3**. Lumina maintains an office located at 111 West Illinois Street, Chicago, Illinois 60654. Lumina is not registered with the Illinois Secretary of State. Lumina has an account with Defendant Community Federal. Plaintiffs' funds were transferred to Defendant Community Federal which were then transferred via banking services offered in this District to Defendant Currency Cloud and then transferred against to Defendant TranSwap.

23.    Upon information and belief, Defendant Lok Him Lo, is the sole owner and control person of Defendant Lumina and, thus, all wrongful acts committed by Lumina were really committed by Lok Him Lo.

24.    Defendant Novaventure incorporated in Hong Kong on June 5, 2024, a few months before the scam began. True and correct copies of Novaventure's Certificate of Incorporation, Incorporation Form, and Articles of Association from the Hong Kong Companies Registry are attached hereto as **Exhibit 4**. Novaventure maintains an office located at 600 Congress Avenue, Austin, Texas 78701. Novaventure is not registered with the Texas Secretary of State. Novaventure has an account with Defendant Community Federal. Plaintiffs' funds were transferred to Defendant Community Federal which were then transferred via banking services offered within this District to Defendant Currency Cloud and then transferred against to Defendant TranSwap.

25.    Upon information and belief, Defendant Jianhao Li, is the sole owner and control person of Defendant Novaventure and, thus, all wrongful acts committed by Novaventure were really committed by Jianhao Li.

**JURISDICTION AND VENUE**

26.    This Court has subject matter jurisdiction over this action pursuant to the Fair Credit Billing Act (hereinafter referred to as the "FCBA"), Securities Exchange Act of 1934 ("1934 Act"), Commodities Exchange Act ("CEA") and 28 U.S.C. § 1331.

27.    This Court may exercise specific jurisdiction over each of Defendants because their

role in perpetuating and/or assisting the fraud against Plaintiffs constituted an injury to Plaintiffs in this jurisdiction, thus rendering the exercise of jurisdiction by this Court proper and necessary.

28.    Venue is proper pursuant to 28 U.S. C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

29.    Recipient Banking Defendants are financial institutions subject to KYC/AML regulations that require establishing proof of an account holder's legal identity to identify suspicious transactions and prevent fraud. This is especially so when banking customers such as the Recipient Banking Defendants accept funds sourced from the United States of America.

30.    KYC regulations are part of the federal Anti-Money Laundering ("AML") laws. The Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq,* applies to the Recipient Banking Defendants.

31.    All financial institutions subject to FinCEN regulations are required to maintain risk-based AML programs. *See* 31 C.F.R. §§ 1010-1020.

32.    Banks, saving associations, credit unions, and certain non-federally regulated banks are required to maintain customer identification programs that, at a minimum: (a) identify the customer and verify that customer's identity using reliable, independent source documents, data or information; b) if an entity instead of individual, identify the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner, such that the financial institution is satisfied that it knows the true and actual identity of the beneficial owner. For legal persons and arrangements this should include financial  institutions understanding the ownership and control structure of the customer; (c) understanding and, as appropriate, obtaining information on the purpose and intended nature of the business relationship; and (d) conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds. 31 C.F.R. §§ 1020.220, 1010.230.

33.    Recipient Banking Defendants are lawfully required to have new business

customers provide certain personal identity and corporate documentation when opening an account. The documents required are part of formal customer identification programs that require identification and verification of their customers' identities to combat money laundering and other illegal activities.

34.    In accordance with commonly accepted standards in the global banking industry, all of these documents routinely go through a verification process. In accordance with this process, Recipient Banking Defendants were expected to inquire as to the nature of the Scammers' business activities, the purpose of the accounts, and anticipated type and dollar value of financial transactions in which the customer is likely to engage. The Recipient Banking Defendants were also to assess and verify the authenticity of the Scammers' documents and information presented to them to open accounts. None of this was performed by the Recipient Banking Defendants in accordance with commonly accepted standards in the banking industry.

35.    Upon receipt of these documents, the Recipient Banking Defendants were required to have the signatories on the Scammers' accounts physically appear to review and verify the documents and the business accounts signatory's true identity. This too was not done by the Recipient Banking Defendants in accordance with commonly accepted standards in the banking industry. Instead, upon the Scammers' active, virtual, or constructive appearances at a branch of the Recipient Banking Defendants (assuming it ever happened at all), the business account manager at the local branch either (1) failed to realize there were material discrepancies and irregularities in the Scammers' corporate and identification documents and/or (2) realized there were discrepancies and irregularities in the documents, but acted with deliberate indifference and assisted the fraudulent actor(s) in opening the Accounts. The motive for such conduct is simple—incentives that Recipient Banking Defendants have in place for account managers to open business accounts are so compelling that those account managers have little or no monetary incentive to refrain from commencing business relationships with accounts that are handsomely funded and will have substantial wire activity.

36.    On information and belief based on the corporate documentation now available to Plaintiffs, it is reasonably believed that each of the Recipient Banking Defendants had in place

practices of willful blindness and deliberate indifference to avoid the complexities and responsibilities associated with addressing these issues and to preserve transaction-related revenues from such suspicious accounts. For example, the corporate documentation for Focusyr suggests the existence of an on-line swimwear retailer run from a home in Commerce City, Colorado, which would frankly have no business sending large sums of money to overseas investment managers and the like. Recipient Banking Defendants appear to have drawn a blind eye toward illicit proceeds moving from the United States, and thus assisted in the extraction of hundreds of thousands of dollars, if not millions, that funded pig-butchering scams.

37.    Recipient Banking Defendants knew, because they were required to know from their reviews and due diligence, that there were no legal purposes whatsoever associated with setup of the Scammers' accounts.

38.    Recipient Banking Defendants should have also discovered that most of the Scammers' businesses were not validly registered with the Secretary of State in each state where their offices were located.

39.    Upon information and belief WTI is run by Defendants Lumina, Novaventure, Visionary, and Focusyr.

40.    Defendants Lumina, Novaventure, Visionary, and Focusyr used WTI as a means of convincing consumers to send them funds.

41.    In furtherance of this scam, Defendants Lumina, Novaventure, and Visionary each opened accounts with Community Federal.

42.    Prior to opening the accounts, Community Federal should have required the signatories on the accounts to physically appear (in person or by video) to review and verify the business documents and the business signatory's true identities. Community Federal did not do this because it made the choice to receive banking revenue from its new customer notwithstanding its characteristics or bona-fides.

43.    Similarly, Currency Cloud and TranSwap should have requested KYC/KYB information for all funds passing through their accounts. Currency Cloud and TranSwap did not do this because they each made the conscious choice to derive banking revenue from its new

customer notwithstanding its characteristics or bona-fides.

44.     Defendant Focusyr opened an account with Choice Financial.

45.     Prior to opening the account, Choice Financial should have—but failed to—require the signatory on the account to physically appear to review and verify the business documents and the business signatory's true identities.

46.     Similarly, Mercury Advisory should have requested KYC/KYB information for all funds passing through the account or had in place written supervisory procedures to facilitate such requests.

47.     Well aware of the institutional weaknesses of the Recipient Banking Defendants in compliance and surveillance of money laundering, the Scammers intentionally co-opted the credibility of the Recipient Banking Defendants to imply AML/KYC procedures were being conducted when in fact they were not.

48.     Despite actual and/or constructive knowledge that the Scammers' accounts were opened for fraudulent purposes without any legitimate business purposes, the Recipient Banking Defendants continued to leave the accounts open and enabled victims like Plaintiffs to wire funds to them.

49.     In July of 2024, the Scammers advertised a stock investment advisory service to Plaintiffs on Facebook called WTI.

50.     Upon joining WTI, Plaintiffs were directed to join a WhatsApp group to learn investment trading strategies purportedly from one Professor Lysander Clark.

51.     In conjunction with providing investment strategies, WTI purportedly sought beta testers to try out WTI's new AI 4.0 stock trading platform and provided participants with a free $500 to test the tool.

52.     On July 15, 2024, Mr. Clark wrote:

Lysander Clark: *Dear friends, as we prepare for the official launch of our revolutionary Ai4.0 system, we are seeking passionate individuals to join our exclusive beta testing program. Your participation is crucial to ensuring the system's stability, performance, and overall effectiveness.*

*Why join the test?*
- *Be among the first to experience the revolutionary Ai4.0 system.*

- *Gain valuable insights into the system's features.*
- *Help us refine and optimize Ai4.0 for an unparalleled user experience.*
- *Contribute to the future of investment education and technology.*

*Leave behind the overwhelming piles of investment knowledge and dive straight into practical application with Ai4.0. Our unique approach combines hands-on experience with step by step learning, enabling you to become an investment expert in no time.*

*We firmly believe that under the guidance of Ai4.0, you can double your investment returns this year. Be among the first to benefit from Ai4.0!*

53.     WTI through its members sought to hype the efficacy of the trading platform. On July 17, 2024, Mr. Clark wrote:

~ Lysander Clark: *In our upcoming Ai4.0 internal testing plan, what direction will I choose?*

*Do you remember last April? We utilized the Ai4.0 system to short gold, watching it plummet from $2,000 to $1,900. Many of you followed my lead, reaping significant profits, with some even seeing returns multiple times over! This operation remains a classic case study, frequently discussed among our members.*

*At the beginning of this year, we swiftly made our mark in the stock market, focusing on the powerhouse stocks $MSTR and $NVDA. The results were astounding, with profits of +260% and +80%, respectively. Is there any other investment strategy that can so precisely capture the pulse of the market and lead us to new heights of wealth?*

*Moving forward, I will guide you to continue our conquest of the investment market, with our sights set firmly on stock options and the cryptocurrency market. Why these two directions?*

*Reason 1: High certainty, with a success rate of 95%!*
*This is not mere rhetoric but verified data from real-world practice. Can any other investment strategy offer such stable and reliable profits, allowing you to earn with peace of mind?*

*Reason 2: Doubling profits, achieving financial freedom with ease!*
*High volatility assets hold tremendous profit potential. By selecting the right direction and capturing market trends, we can achieve exponential profit growth!*

*Of course, while pursuing high profits, we must never overlook risk control. I will prioritize and select strategies with higher "risk control coefficients" to ensure we leave nothing to chance.*

[7/17/24, 8:13:30 AM] ~ Mark Anderson: The accuracy of the AI4.0 system was perfectly demonstrated in the successful investments in MSTR and NVDA. Looking forward to achieving more victories together in the investment market! 💪

54.     After supposedly trading and accomplishing incredible returns on WTI's trading platform during the first beta test, the Scammers invited Plaintiffs and others to conduct a second

beta test.

55.     In promoting the second beta test, Plaintiffs were invited to utilize their own funds to trade tokens of WTI, which were presented as proxies for its stock.

[7/23/24, 7:57:28 AM] ~ Lysander Clark: *It is emphasized that this test is crucial for us, and everyone must strictly adhere to the regulations to ensure the authenticity and validity of the test data. Your diligence and focus are the foundation of our success.*

*Can You Use Your Own Funds for Trading?*

*Principally, it is not allowed. However, friends who have successfully completed the first internal test can voluntarily use their own funds for trading. Since you are already fully familiar with the contract tools, you can maintain calmness and precision in your operations.*

*For those who did not participate in the first internal test, you are only allowed to use the $500 provided by the sponsor for contract trading. This is to avoid unnecessary errors due to unfamiliarity with the operations. I do not want anyone to take risks for my project, not even a penny. The reputation of our Institute is paramount, and every step must be taken cautiously.*

*Real data is more important than temporary profits. Only by not using your own funds can you approach trading with a calm mindset, thereby obtaining authentic and effective data. If it is found that you are participating in the test for the first time but using your own funds, I will consider it as a sign that you do not take this test plan seriously, and your testing qualification will be revoked.*

*Your cooperation and understanding are crucial to us. Thank you for your support and compliance.*
[7/23/24, 8:02:08 AM] ~ Ashley Martin: Got it I will strictly follow the rules
[7/23/24, 8:03:31 AM] ~ Alexander Gonzalez: We all have a responsibility to protect the institute's rep and following the rules is our duty. Tks for organizing this well structured test I will give it my all 🙌
[7/23/24, 8:04:51 AM] ~ William Jones: Wow that's awesome! This means I can fund my account and follow the prof's signals for trading 😎
[7/23/24, 8:09:41 AM] ~ James Smith: Honestly I wanted to use my own funds during the first test. Just imagine if I had invested 10K back then I would have already made 13K profit by now

56.     Plaintiffs were again encouraged to purchase the Institute's Tokens:

[7/23/24, 1:53:20 PM] ~ Daniel Bell: *Folks, I know you've already felt the immense power of the AI 4.0 system in our first internal test—9 straight wins and an astonishing 131.40% total asset return. My God, this is an unstoppable force!*

*Let's be real—AI 4.0 isn't just about helping investors make smarter decisions; it's about pushing investment returns to unprecedented heights. This is not only a significant milestone for our Institute but also a monumental shift in the entire investment education industry and market. For those who crave long-term, stable growth driven by technological innovation, Institute tokens are your golden ticket. With the second internal test of AI 4.0 just around the corner, Institute tokens are

hotter than ever. Stop waiting—act now, seize the opportunity, and don't let it slip away!*

*When the first internal test of the AI 4.0 system began, I urged you to buy in at $1.80, and now it has soared by about 60%. As the second internal test unfolds, Institute tokens are about to explode. Get ready—you're about to see a rocket take off!*

57.     On July 29, 2024, Olivia Christie with WTI directed Plaintiffs to direct their wire transfers through Lencoin.

58.     According to Ms. Christie:

[L]encoin exchange has got the United States MSB certification, MSB is the United States has the highest authority of the financial management institutions, because the MSB is specialized in the jurisdiction of the global regular exchange, including the fire coins, Coinbase, OKEX belongs to the MSB jurisdiction.

To get the MSB license, you need to pay a large deposit to the MSB, the MSB will also review the exchange for five years without any investor complaints, before issuing the MSB certified license.

As long as there is any investor feedback lencoin exchange irregular or not allow investors to normal access to the gold, and other behavior, MSB has the right to confiscate lencoin exchange to pay all the margin, and withdraw the MSB license, life can not apply for a license MSB, but also included in the list of blacklist.

So please rest assured, lencoin exchange in the MSB deposit are hundreds of billions of dollars, Lencoin exchange also do not want to appear any complaints, affecting the exchange's long-term long-term development.

The WFI tokens of our WT Academy are also listed on the Lencoin Exchange, and the Lencoin Exchange is also a partner of our Academy. So you can invest with confidence and boldness. Do you understand?

59.     Lencoin registered with FinCen on April 10, 2024. Among the many false and misleading statements above, the representations about MSB registration with FinCen and its costs were lies. FinCen does not charge a registration fee or deposit. FinCen does not vet applicants for participation in its services.

60.     Lencoin was to supposedly "match" Plaintiffs with merchants who used the WTI token to ensure Plaintiffs received the best conversion rate. WTI explained the process as follows:

*How C2C works:*

*Imagine that C2C trading is as simple as exchanging currency at a money exchange point while traveling. Here, you are buying and selling cryptocurrencies like USDT with cash. Each time you complete a transaction with someone else, the price difference is how the exchange earns its profit.*

*For the sake of transaction security and smoothness, C2C trading platforms

require every participating merchant to deposit a significant security bond. This is a safeguard to ensure the reliability of transactions and the integrity of merchants.*

*The trading center carefully selects a merchant alliance with active trading, high user ratings, and the best exchange rates for users, ensuring that each of your exchanges is the most economical and safest.*

61.     According to the Washington State Department of Financial Institutions, published December 2, 2024, Lencoin Tech Corp. was an "alleged cryptocurrency scam operation . . . incorporated in Washington State." None of the Defendants took any steps or caused to take steps to alert Plaintiffs as to the warnings from Washington's primary securities regulator and instead continued to position themselves as providing legitimate financial services when in fact they were not and found to have not.

62.     Lencoin directed Plaintiffs to transfer their funds to the Scammer "merchants" Lumina, Novaventure, Visionary, and Focusyr.

63.     On July 30, 2024, Plaintiffs wired $31,000 from their ETRADE Brokerage account to Lumina's Community Federal Savings Bank account ending in 0987.

64.     Plaintiffs were later informed by Community Federal after learning that WTI was a fraud that the funds were transferred from Community Federal to Currency Cloud and then from Currency Cloud to TranSwap.

65.     On July 31, 2024, Plaintiffs wired $40,000 from their EverBank account to Novaventure's Community Federal Savings Bank account ending in 1547.

66.     Plaintiffs were later informed by Community Federal that the funds were transferred from Community Federal to Currency Cloud and then from Currency Cloud to TranSwap.

67.     Also on July 31, 2024, Plaintiffs wired $19,251 from their ETRADE Brokerage account to Visionary's Community Federal Savings account ending in 7434.

68.     On August 1, 2024, Plaintiffs wired $57,000 from their ETRADE Brokerage account to Lumina's Community Federal account ending in 0987.

69.     Plaintiffs were later informed by Community Federal that the funds were transferred from Community Federal to Currency Cloud and then from Currency Cloud to TranSwap.

70. Also on August 1, 2024, Plaintiffs wired $200,000 from their Stanford FCU account to Visionary's Community Federal account ending in 7434.

71. Plaintiffs were later informed by Community Federal that the funds were transferred from Community Federal to Currency Cloud and then from Currency Cloud to TranSwap.

72. On August 2, 2024, Plaintiffs wired $22,000 from their ETRADE Savings account to Focusyr's Choice Financial account.

73. Plaintiffs were later informed that Choice Financial kept customer funds in Mercury Advisory's account ending in 8737.

74. Also on August 2, 2024, Plaintiffs wired $200,000 from their Stanford FCU account to Visionary's Community Federal bank account ending in 7434.

75. Plaintiffs were later informed by Community Federal that the funds were transferred from Community Federal to Currency Cloud and then from Currency Cloud to TranSwap.

76. Transactions totaling nearly $600,000 took place over five days without a single inquiry or red flag raised.

77. Plaintiffs also wired $28,700 to a scam crypto wallet address 0x0745aa1b7b8cc9dcfa5581c775f18fc12a356fd5.

78. Compounding matters further, the $400,000 wired from Stanford FCU was credit from a Home Line of Credit ("HELOC"). Stanford FCU failed to reasonably enquire as to the purpose of Plaintiffs' drawing from their HELOC. Had Stanford FCU engaged in a basic review of the purpose of the funds drawn by Plaintiffs, Stanford FCU would have not only prevented funds from being lost but would also have informed regulatory authorities of corporate irregularities.

79. Despite the rising prevalence of pig butchering scams and Plaintiffs' transactions bearing virtually all of the indicia of being a part of such a scheme, no representative from the Initiating Banking Defendants, other than EverBank, inquired further as to why Plaintiffs were transferring such large amounts to Community Federal and Choice Financial.

80.     Upon discovering the scheme, on August 4, 2024, Plaintiffs called emailed each of the Initiating Banking Defendants regarding the fraud and requested them to immediately recall the wire transfers.

81.     During a call with Community Federal, a representative advised Plaintiffs that the Lumina and Novaventure accounts were flagged as fraudulent on August 2, 2024, before Plaintiffs' second wire transfer of $200,000 was deposited.

82.     Of the nearly $600,000 transferred, Plaintiffs have only recovered $11,000 from Choice Financial to Plaintiff's Etrade account.

83.     Stanford FCU failed to reasonably investigate Plaintiffs' dispute.

84.     Stanford FCU failed to return the funds to Plaintiffs' account.

## COUNT I
### FAIR CREDIT BILLING ACT
### (Against Defendant Stanford Federal Credit Union)

85.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

86.     On August 4, 2024, Plaintiffs emailed Stanford FCU regarding the fraudulent HELOC wire transfer, identifying their names and account numbers and requesting Stanford FCU recall the transfer.

87.     Stanford FCU neither credited the account, nor sent a written explanation to Plaintiffs, after having conducted an investigation, setting forth the reasons why Plaintiffs owe the funds.

88.     Nevertheless, Stanford FCU has requested repayment of the $400,000 plus interest accrued thereon in violation of 15 U.S.C. §1666(g).

## COUNT II
### VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5.
### (Against Defendants WTI, Visionary, Focusyr, Lumina, and Novaventure)

89.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

90.     Defendants WTI, Visionary, Focusyr, Lumina, and Novaventure violated Section

10(b) and Rule 10b-5 of the 1934 Act by engaging in a scheme to defraud Plaintiffs in connection with the purchase or sale of securities. The Scammers advertised and operated WTI as an investment school offering a purported AI 4.0 stock trading platform.

91.     The Scammers made material misrepresentations and omissions, including falsely representing that Plaintiffs' wired funds would be used for stock trading on the WTI platform, when in fact the funds were to be diverted for the Scammers' personal use and thus intentionally diverted from their intended recipients.

92.     These frauds occurred in connection with the purchase or sale of securities, as the Scammers solicited and received funds expressly for investment in stocks via the AI trading platform, inducing Plaintiffs to wire approximately $597,951 between July 30, 2024, and August 2, 2024, for purported stock trading that never occurred. See, e.g., *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding a "broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5.")

93.     Plaintiffs justifiably relied on the Scammers' misrepresentations and omissions, wiring the funds based on the promise of stock trading access and returns demonstrated during the beta test period.

94.     As a result of the Scammers' violations, Plaintiffs suffered economic loss in the amount of the wired funds, which were not returned or used for any securities investments.

95.     Plaintiffs seek damages, including rescission, compensatory damages, punitive damages, and attorneys' fees as permitted under the 1934 Act.

**COUNT III**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Tengfei Yang, Hiu Fung Lui, Lok Him Lo and Jianhao Li)**

96.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

97.     Defendants WTI, Visionary, Focusyr, Lumina, and Novaventure through their respective owners and control persons Tengfei Yang, Hiu Fung Lui, Lok Him Lo and Jianhao Li, engaged in a scheme to defraud Plaintiffs in connection with the purchase or sale of securities by causing, facilitating, advertising and operating WTI as an investment school offering a purported

AI 4.0 stock trading platform when in fact it was known or should have been known by each of them to be a scam.

98.    The control people/Scammers made or caused to make material misrepresentations and omissions relied upon by Plaintiffs, including but not limited to falsely representing that Plaintiffs' wired funds would be used for stock trading on the WTI platform, when in fact the funds were to be diverted for the Scammers' personal use and thus intentionally diverted from their intended recipients.

99.    These frauds occurred in connection with the purchase or sale of securities, as the Scammers solicited and received funds expressly for investment in stocks via the AI trading platform, inducing Plaintiffs to wire approximately $597,951 between July 30, 2024, and August 2, 2024, for purported stock trading that never occurred. See, e.g., *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding a "broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5.")

100.    Plaintiffs justifiably relied on the Scammers' misrepresentations and omissions they caused, facilitated or advertised, wiring the funds based on the promise of stock trading access and returns demonstrated during the beta test period.

101.    As a result of the Scammers' violations, Plaintiffs suffered economic loss in the amount of the wired funds, which were not returned or used for any securities investments.

102.    Plaintiffs seek damages, including rescission, compensatory damages, punitive damages, and attorneys' fees as permitted under the 1934 Act.

**COUNT IV**
**VIOLATIONS OF SECTION 10(b) AND RULE 10b-5**
**(Against Defendants Community Federal, Choice Financial, Currency Cloud, TranSwap, and Mercury Advisory)**

103.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

104.    The Recipient Banking Defendants actively, intentionally or blindly assisted in the Scammers' violations of Section 10(b) and Rule 10b-5 by providing substantial assistance to the fraudulent scheme with actual knowledge or reckless disregard of the fraud.

105.    The Recipient Banking Defendants knew or should have known of the Scammers' fraud, as the Scammer entities provided no credible evidence of legitimate business activities, and bore red flags such as unverifiable addresses and lack of beneficial owner verification, in violation of KYC/AML requirements under the Bank Secrecy Act and industry standards. Despite these red flags, the Recipient Banking Defendants opened and maintained accounts for the Scammers, allowing the receipt and transfer of Plaintiffs' funds. The Lumina and Novaventure accounts were flagged as fraudulent on August 2, 2024—before Plaintiffs' second wire transfer of $200,000 was deposited—and Recipient Banking Defendants refused to freeze the accounts and prevent further loss by Plaintiffs.

106.    The Recipient Banking Defendants provided substantial primary assistance to the Scammers by intentionally: (a) failing to conduct required due diligence during account opening; (b) ignoring flags of fraudulent activity, including prior reports of fraud on certain accounts; (c) facilitating the transfer of funds to international entities like Currency Cloud and TranSwap without any reasonable modicum of verification; and (d) refusing to return funds after notification of the fraud.

107.    Plaintiffs, by way of the Recipient Bank Defendants' "shingle" to the public, had no reason to believe that any of them were doing anything but acting in compliance with federal securities laws and had reasonably crafted policies and procedures for that very purpose.

108.    These acts in violation of federal securities laws were a primary cause of Plaintiffs' losses, as it enabled the Scammers to perpetrate the scheme and retain the misappropriated funds intended for securities investments.

109.    Plaintiffs seek damages, including rescission, compensatory damages, punitive damages, and attorneys' fees as permitted under the Securities Exchange Act.

**COUNT V**
**VIOLATION OF SECTIONS 4b AND 6(c)(1) OF THE COMMODITY EXCHANGE ACT**
**(Against Defendants WTI, Visionary, Focusyr, Lumina, and Novaventure)**

110.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

111.    Sections 4b and 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6b

and 9(1), prohibit fraud, misrepresentations, and deceptive practices in connection with transactions involving commodities, including cryptocurrencies, which are treated as commodities under CEA jurisdiction.

112.    The Scammers violated Sections 4b and 6(c)(1) by engaging in a fraudulent scheme involving commodities. As part of the pig-butchering scam, the Scammers induced Plaintiffs to transfer $28,700 to a crypto wallet address (0x0745aa1b7b8cc9dcfa5581c775f18fc12a356fd5) under the guise of purchasing Tether to invest on the WTI platform, which was presented as a revolutionary trading tool but diverted funds without any legitimate commodity transactions.

113.    The Scammers made material misrepresentations and omissions, including falsely promising that the transferred funds, including the cryptocurrency wire, would be used for trading and investment purposes, when in fact they were misappropriated.

114.    The fraud occurred in connection with commodity transactions, as cryptocurrencies are commodities, and the scheme involved solicitation for purported investment in digital assets or related trading, consistent with pig-butchering scams targeting crypto investments.

115.    Plaintiffs relied on these misrepresentations, transferring the $28,700 to the crypto wallet as part of the overall investment inducement.

116.    As a result of the aforementioned violations of the CEA, Plaintiffs suffered losses from the unreturned cryptocurrency transfer.

117.    Plaintiffs seek damages, including actual damages, disgorgement, civil penalties, and attorneys' fees as permitted under the CEA.

**COUNT VI**
**VIOLATION OF SECTION 13(b) OF THE COMMODITY EXCHANGE ACT**
**(Against Defendants Tengfei Yang, Hiu Fung Lui, Lok Him Lo and Jianhao Li)**

118.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

119.    The Scammers' owners and control persons personally engaged or caused to engage entities they controlled in a fraudulent scheme involving commodities. As part of the pig-butchering scam, the control persons directed WTI to induce Plaintiffs to transfer $28,700 to a crypto wallet address (0x0745aa1b7b8cc9dcfa5581c775f18fc12a356fd5) to purchase Tether to

invest on the WTI platform, which was presented as a revolutionary trading tool but diverted funds without any legitimate commodity transactions.

120.    The Scammers made or caused to make material misrepresentations and omissions, including falsely promising that the transferred funds, including the cryptocurrency wire, would be used for trading and investment purposes, when in fact they were misappropriated.

121.    The fraud occurred in connection with commodity transactions, as cryptocurrencies are commodities, and the scheme involved solicitation for purported investment in digital assets or related trading, consistent with pig-butchering scams targeting crypto investments.

122.    Plaintiffs relied on these misrepresentations of the Scammers, transferring the $28,700 to the crypto wallet as part of the overall investment inducement.

123.    As a result of the aforementioned violations of the CEA by the Scammers, Plaintiffs suffered losses from the unreturned cryptocurrency transfer.

124.    Plaintiffs seek damages, including actual damages, disgorgement, civil penalties, and attorneys' fees from the Scammers as permitted under the CEA.

**COUNT VII**
**AIDING AND ABETTING VIOLATIONS OF SECTIONS 4b AND 6(c)(1) OF THE COMMODITY EXCHANGE ACT**
**(Against Defendants Community Federal, Choice Financial, Currency Cloud, TranSwap, and Mercury Advisory)**

125.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

126.    The Recipient Banking Defendants aided and abetted the Scammers' CEA violations by providing substantial assistance with knowledge or reckless disregard of the fraud involving commodities.

127.    The Recipient Banking Defendants knowingly and intentionally facilitated the overall scheme, which included the cryptocurrency transfer, by maintaining fraudulent accounts and transferring funds without proper KYC/AML compliance, enabling the Scammers to receive and launder proceeds from the crypto-related fraud.

128.    Even after flagging the Lumina and Novaventure accounts as fraudulent on August 2, 2024—before Plaintiffs' second wire transfer of $200,000 was deposited—the Recipient

1    Banking Defendants continued to transfer stolen funds to the Scammers.

2        129.    This intentional and knowing assistance proximately caused Plaintiffs' losses in the

3    cryptocurrency portion of the scam.

4        130.    Plaintiffs seek damages, including actual damages, disgorgement, civil penalties,

5    and attorneys' fees as permitted under the CEA.

6                                    **COUNT VIII**
                                     **FRAUD**
7          **(Against Defendants WTI, Visionary, Focusyr, Lumina and Novaventure)**

8        131.    Plaintiffs incorporate by reference the allegations contained in the foregoing

9    paragraphs as if set forth herein.

10       132.    Defendants Visionary, Focusyr, Lumina and Novaventure, through WTI, induced

11   Plaintiffs to transfer funds to them to purchase tether for use on their revolutionary AI 4.0 stock

12   trading platform.

13       133.    The Scammers represented that the funds would be used for stock trading using the

14   WTI tool.

15       134.    Rather than make the convert the funds to be available for stock trading, the

16   Scammers diverted the funds to their own personal use.

17       135.    From July 30, 2024 to August 2, 2024, Plaintiffs transferred approximately

18   $597,951 to the Scammers as follows: $88,000 to Defendant Lumina; $419,251 to Defendant

19   Visionary; $40,000 to Defendant Novaventure; $22,000 to Defendant Focusyr; and $28,700 to a

20   crypto wallet address (0x0745aa1b7b8cc9dcfa5581c775f18fc12a356fd5).

21       136.    The Scammers knew their wire instructions were false and illegal.

22       137.    The Scammers intended that Plaintiffs rely on their misrepresentations to their

23   ultimate detriment which they did by sending funds for use in stock trading.

24       138.    Plaintiffs have been damaged by the Scammers' conduct.

25                                   **COUNT IX**
                             **AIDING AND ABETTING FRAUD**
26   **(Against Community Federal, Choice Financial, Currency Cloud, TranSwap and Mercury**
                                    **Advisory)**
27
28       139.    Plaintiffs incorporate by reference the allegations contained in the foregoing

paragraphs as if set forth herein.

140.    The Recipient Banking Defendants' (Community Federal, Choice Financial, Currency Cloud, TranSwap and Mercury Advisory) account holders, the Scammers (Lumina, Visionary, Novaventure and Focusyr), perpetrated a fraud on Plaintiffs and obtained the stolen proceeds.

141.    The Scammers intended for Plaintiffs rely on their representations that they would convert Plaintiffs funds to tether.

142.    The Recipient Banking Defendants were aware that there was a high probability that the Scammers intended to defraud victims like Plaintiffs because the Scammers did not provide any substantiation for purported lawful activities they intended to conduct through the accounts at issue.

143.    The Recipient Banking Defendants undertook deliberate action or inaction to avoid learning these facts by omitting to reasonably conduct KYC/AML procedures that would have at least prevented these individuals from setting up bank accounts to defraud Plaintiffs and others. The Recipient Banking Defendants intentionally chose to remain ignorant to be able to abstain from taking affirmative action, because they receive incentives for opening new accounts.

144.    The Recipient Banking Defendants rendered substantial assistance to the Scammers in perpetrating their fraud by (i) deliberately choosing to abstain from KYC/AML procedures prescribed in both the Bank Secrecy Act and intentional standards as set forth in the FATF that would have easily revealed the fraudulent nature of this enterprise; (ii) taking no action upon learning that the Scammers used the bank account for illegal or improper purposes; (iii) disregarding proper protocol in the opening and/or maintenance of the Scammer's accounts; and (iv) permitting the Scammer's account to remain open despite its lack of proof of any legitimate business.

145.    Even after flagging the Lumina and Novaventure accounts as fraudulent on August 2, 2024—before Plaintiffs' second wire transfer of $200,000 was deposited—the Recipient Banking Defendants continued to transfer stolen funds to the Scammers.

146.    Such conduct amounts to the Recipient Banking Defendants' assenting to the

tortious conduct and lending its approval and assistance.

147.    Plaintiffs have been damaged by the conduct of the aforementioned Recipient Banking Defendants.

**COUNT X**
**CONVERSION/AIDING & ABETTING CONVERSION**
**(Against the Scammers and Recipient Banking Defendants)**

148.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

149.    To the extent necessary, this cause of action is pled in the alternative.

150.    Plaintiffs had a possessory right or interest in their funds transferred to the Scammers and Recipient Banking Defendants for trading.

151.    Rather than provide the funds for Plaintiffs' stock trading use, the Scammers diverted the funds to their own use.

152.    When Plaintiffs notified the Recipient Banking Defendants of the Scammers' fraud (immediately after the transfer), the Recipient Banking Defendants refused to return Plaintiffs' funds thereby exercising dominion over Plaintiffs' funds, in derogation of Plaintiffs' rights, and unlawfully diverted or knowingly or recklessly aided in the diversion of those funds for unauthorized use.

153.    All the Defendants have refused to return Plaintiffs' funds.

**COUNT XI**
**CIVIL CONSPIRACY**
**(Against the Scammer Defendants)**

154.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

155.    To the extent necessary, this cause of action is pled in the alternative.

156.    The Scammers conspired to defraud Plaintiffs of their money through a fraudulent stock trading platform.

157.    The Scammers committed overt acts in furtherance of the agreement to defraud Plaintiffs. The Scammers, through WTI, misrepresented the existence of a purported stock trading platform and provided Plaintiffs with instructions for wiring money. The Scammer Defendants

used their bank accounts to receive Plaintiffs' money to give the scheme credibility, enticing Plaintiffs to transfer hundreds of thousands of dollars.

158.    The Scammers intentionally committed the above overt acts in furtherance of the plan to defraud Plaintiffs.

159.    Plaintiffs have been damaged as a result of the agreement and acts of the aforementioned Defendants.

**COUNT XII**
**NEGLIGENCE**
**(Against Community Federal, Choice Financial, Currency Cloud and TranSwap)**

160.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

161.    To the extent necessary, this cause of action is pled in the alternative.

162.    The BSA and FATF provisions stated above set a standard of care the Recipient Banking Defendants must ascribe to. This includes the duty to adhere to the requirements of KYC/AML laws and/or internal policies to prevent fraudulent accounts from being opened in the first place to perpetuate fraud with the banks' stamp of approval.

163.    The Recipient Banking Defendants' decisions to turn a blind eye to vetting the Scammers instead of completing due diligence created a special relationship between the banks and Plaintiffs, who faced an increased risk of harm as a result of the banks' deliberate indifference. Plaintiffs were part of a foreseeable class of persons who would be harmed by the Scammers seeking to exploit the operational and compliance failures of the Recipient Banking Defendants to conduct any due diligence.

164.    The Recipient Banking Defendants breached the common law duties they each owed to Plaintiffs by failing to exercise reasonable care in their respective account opening procedures and subsequent administration.

165.    The Recipient Banking Defendants should have, in accordance with commonly accepted industry standards in the banking industry, verified the Scammers' documents and addresses with identification materials as basic as a driver's license before allowing them to open accounts with them. They apparently did neither.

166.    Had the Recipient Banking Defendants collected any information on the Scammers' operations and institutions, this information would have reasonably allowed for the detection and reporting of instances of suspicious activity and fraud through those accounts.

167.    By transferring money to an account opened without adhering to KYC/AML procedures and internal policies, the Recipient Banking Defendants proximately caused Plaintiff to be damaged.

168.    Even after flagging the Lumina and Novaventure accounts as fraudulent on August 2, 2024—before Plaintiffs' second wire transfer of $200,000 was deposited—the Recipient Banking Defendants continued to transfer stolen funds to the Scammers.

169.    Recipient Banking Defendants have further breached the common law duty they owed to Plaintiffs by failing to return Plaintiffs' funds to the extent Plaintiffs' funds are still held by Recipient Banking Defendants.

## COUNT XIII
## BREACH OF CONTRACT
### (Against Defendants Stanford FCU and EverBank)

170.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

171.    To the extent necessary, this cause of action is pled in the alternative.

172.    A banking institution's account agreement creates a contractual relationship between a bank and its customer.

173.    Implicit in this relationship is the duty to exercise reasonable or ordinary care in the performance of the contract, thereby allowing a bank customer to sue in contract for breach of that duty.

174.    The BSA/AML, Plaintiffs' deposit agreements with Stanford FCU and EverBank, and customary banking practices establish that reasonable commercial standards in consumer banking requires Defendants to identify and investigate suspicious transactions by their customers and to intervene when that investigation yields evidence of financial exploitation or abuse. These heightened procedures to protect customers from exploitation and abuse are fundamental elements of Defendants' consumer banking operations and are incorporated into the duty of ordinary care

they owe to their customers.

175.    Plaintiffs transferred $400,000 from Standford FCU in quick succession over only 2 days. These banking activities were in sharp contrast to the historical spending habits of these customers who had never before used the Stanford FCU HELOC funds since they became available in 2022.

176.    Under the circumstances, reasonable or ordinary case required Defendants to investigate the highly suspicious wire transfers further, freeze Plaintiffs' account, conduct compliance checks, justify the origin of the money by requesting supporting documentation (such as an invoice for services provided), and/or contacting recipients of outbound transactions to ensure the transfers are for legitimate purposes.

177.    Defendants' failure to do anything defies standards that unreasonably vary from the general standards followed by similarly situated banks and constitute bad faith.

178.    Defendants' failure to investigate and take protective action constitutes breaches of its duty of reasonable or ordinary care and breaches of contract under the deposit account agreements by repeatedly ignoring all indications that Plaintiffs were being defrauded.

179.    Defendants' failure to investigate and intervene to stop Plaintiffs' wire transfers constitute separate breaches of contract under their deposit account agreements.

180.    Defendants' breaches have caused Plaintiff damages.

181.    Plaintiffs have been damaged by the aforementioned conduct.

**COUNT XIV**
**Unjust Enrichment**
**(Against All Defendants)**

182.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

183.    To the extent necessary, this cause of action is pled in the alternative.

184.    The Scammers received nearly $600,000 from Plaintiffs under the guise that the funds would be used to invest on WTI's AI stock trading platform.

185.    The Recipient Banking Defendants provided account services to the Scammers and those accounts were used to carry out the fraud against Plaintiffs.

186.    The Initiating Banking Defendant received revenue generated from processing Plaintiffs' wire requests.

187.    The funds held in the accounts belonged to investors, including Plaintiffs.

188.    Plaintiffs conferred benefits upon the Scammers in the form of their fund transfers. Plaintiffs also conferred benefits upon the Recipient Banking Defendants in the form of almost $600,000 of deposits from which the Recipient Banking Defendants generated income, including, but not limited to, interest, transfer fees, service fees, transaction fees, and online banking fees.

189.    Defendants knowingly and voluntarily accepted and retained the funds, deposits and/or those benefits.

190.    Because the Scammers received funds or benefits from funds that were never put to their intended use, it would be inequitable for them to retain the benefits of the fund transfers made with Plaintiffs' money. As to the Recipient Banking Defendants, because the banks' provision of banking services assisted the Scammers in the fraud, it would be inequitable for the Recipient Banking Defendants to retain the benefits they generated from Plaintiffs' money.

191.    As to Stanford FCU and EverBank, because their failure to protect their own banking customers upon constructive notice of financial abuse, it would be inequitable for them to retain the fee benefits they generated from Plaintiffs' money.

**COUNT XV**
**Violation of California Business & Professions Code § 17200 et seq.**
**(Against Community Federal, Choice Financial, Currency Cloud, TranSwap, WTI, Visionary, Focusyr, Lumina and Novaventure)**

192.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

193.    To the extent necessary, this cause of action is pled in the alternative.

194.    Each of the Defendants committed acts of unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising, as defined by Business and Professions Code § 17200 et seq.

195.    As set forth in detail above, the Scammers perpetrated a fraudulent cryptocurrency investment scheme against Plaintiffs.

196.    The Recipient Banking Defendants' negligence in assisting said frauds as set forth above constitutes unlawful conduct under the UCL.

197.    The harm to Plaintiffs far outweighs the utility of the Recipient Banking Defendants' ineffective policies and practices for customers expected to transact business with persons or entities in the United States. Recipient Banking Defendants and each of their policies and practices are further immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and, therefore, against public policy.

198.    Each of Recipient Banking Defendants' policies and practices consequently constitute "unfair" business acts or practices within the meaning of Business and Professions Code §17200 such that significant additional monetary damages should also be awarded in favor of Plaintiffs and against all Recipient Banking Defendants.

199.    Recipient Banking Defendants' deceptive policies and practices as set forth above deceived Plaintiffs and likely others to invest in purported cryptocurrency trading opportunities when in fact they assisted, aided and abetted malevolent pig-butchering schemes.

200.    Even after flagging the Lumina and Novaventure accounts as fraudulent on August 2, 2024—before Plaintiffs' second wire transfer of $200,000 was deposited—the Recipient Banking Defendants continued to transfer stolen funds to the Scammers.

201.    Plaintiffs suffered monetary loss and hereby seek equitable monetary relief and an order enjoining Recipient Banking Defendants from engaging in these deceptive acts and practices set forth herein and imposing an asset freeze or constructive trust over such monies.

**PUNITIVE DAMAGES REQUESTED**

202.    The collective conduct of the Recipient Banking Defendants and Scammers in this case erodes public confidence of California residents in the soundness and safety of the global banking system. An example should be made of them so that fraudsters and those who harbor them no longer prey on hard-working Californians as "pigs" to be "butchered." In accordance with California Civil Code § 3294, Plaintiffs are properly and legally entitled to an additional award of punitive damages in a sufficient amount, to punish and to make an example of the Recipient Banking Defendants and Scammers named herein so as to deter such fraudulent, oppressive, and

malicious misconduct in the future in a total amount according to proof at the time of trial, no less than $3 million.

## DEMAND FOR JURY

203.    Plaintiff demands a jury trial for determination as to all causes of action as herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief against the Defendants as follows:

1.    For any and all economic damages according to proof which at this time are believed to be in excess of $600,000.00;

2.    For punitive damages of no less than $3,000,000.00,

3.    For special damages according to proof at trial;

4.    For any and all prejudgment interest, post judgment interest according to proof at trial;

5.    For attorney's fees and costs that are allowed by law;

6.    For punitive damages against Defendants in an amount to be determined according to proof at trial but no less than $3 million; and

7.    For such other and further relief as the Court deems just and proper.


Dated: August 27, 2025              **LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**


                                    */s/ Keren E. Gesund*
                                    KEREN E. GESUND
                                    *Attorneys for Plaintiffs*

COMPLAINT